No. 24-4023

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

RALPH COLEMAN, *et al*.,
*Appellees*,

v.

GAVIN NEWSOM, *et al*.,
*Appellants*.

_____

**On Appeal from the United States District Court
for the Eastern District of California**
No. 2:90-cv-00520 KJM-DB (PC)
The Honorable Kimberly J. Mueller

_____

**Defendants-Appellants' Reply Brief**

_____


Rob Bonta
  *Attorney General of California*
Monica N. Anderson
  *Senior Assistant Attorney General*
Neah Huynh
  *Supervising Deputy Attorney General*
Randall D. Zack
  *Deputy Attorney General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 510-3502
Email: Randy.Zack@doj.ca.gov
  *Attorneys for Defendants-Appellants*

November 12, 2024

# TABLE OF AUTHORITIES

**Page**

INTRODUCTION ..........................................................................................1

ARGUMENT...............................................................................................1

I. The District Court Erred by Rejecting Defendants' Substantial Compliance and All-Reasonable-Steps Defenses. ..................................................................................1

    A. The District Court Misread Its Prior Orders and Failed to Holistically Assess Defendants' Substantial Compliance.................................................3

        1. The Court's Prior Orders Set 10% Vacancies as Full Compliance, Not as Substantial Compliance or a Safe Harbor..........3

        2. The District Court Erroneously Rejected Defendants' Substantial Compliance Defense by Applying a Rigid 10% Threshold……………………………………………..5

    B. The District Court Erroneously Rejected Defendants' All-Reasonable-Steps Defense. ...................9

        1. Defendants Took All Reasonable Steps with Respect to Mental Healthcare Provider Compensation……………………………………9

        2. That Other Possible Steps Existed Does Not Show Defendants Did Not Take All Reasonable Steps…………………………..14

II. The District Court Erroneously Rejected Defendants' Impossibility Defense. ...........................................19

III. The District Court Imposed Serious, Punitive Fines Without Providing Criminal Due Process. ............................24

IV. The District Court Did Not Use the Least Possible Power When It Sanctioned Defendants' $170 Million in Fines. ........31

CONCLUSION ..........................................................................................32

# TABLE OF AUTHORITIES
## (continued)

Page

CASES

*CBS Broadcasting, Inc. v. FilmOn.com, Inc.*
  814 F.3d 91 (2d Cir. 2016)................................................................ 27, 28

*Chairs v. Burgess*
  143 F.3d 1432 (11th Cir. 1998)............................................................. 21

*Coleman v. Newsom*
  No. 23-15755, 2024 WL 4298158 (9th Cir. Sept. 26, 2024).................... 15

*Evans v. Williams*
  206 F.3d 1292 (D.C. Cir. 2000) ........................................................ 30, 31

*F.T.C. v. Affordable Media*
  179 F.3d 1228 (9th Cir. 1999)................................................................ 20

*Falstaff Brewing Corp. v. Miller Brewing Co.*
  702 F.2d 770 (9th Cir. 1983)............................................................ *passim*

*Hook v. Arizona Dep't of Corr.*
  107 F.3d 1397 (9th Cir. 1997).......................................................... 18, 20

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*
  10 F.3d 693 (9th Cir. 1993)............................................................. *passim*

*Int'l Union, United Mine Workers of Am. v. Bagwell*
  512 U.S. 821 (1994)....................................................................... *passim*

*Kelly v. Wengler*
  822 F.3d 1085 (9th Cir. 2016)................................................................. 2

*Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*
  564 F.3d 1115 (9th Cir. 2009)..................................................... 2, 5, 6, 9

*NLRB v. Ironworkers Local 433*
  169 F.3d 1217 (9th Cir. 1999).......................................................... 28, 29

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Parsons v. Ryan*
  949 F.3d 443 (9th Cir. 2020)................................................................... 29

*Salazar v. Dist. Columbia*
  602 F.3d 431 (D.C. Cir. 2010) ................................................................ 27

*Sekaquaptewa v. MacDonald*
  544 F.2d 396 (9th Cir. 1976)..................................................................... 2

*Spain v. Mountanos*
  690 F.2d 742 (9th Cir. 1982).................................................................... 18

*Spallone v. U.S.*
  493 U.S. 265 (1990)................................................................................ 31

*Stone v. City and County of San Francisco*
  968 F.2d 850 (9th Cir. 1992)..................................................................... 2

*U.S. v. Rylander*
  460 U.S. 752 (1983)....................................................................19, 21, 23

## STATUTES

California Government Code
  § 8658........................................................................................... 18

California Penal Code
  § 2900(b) ........................................................................................ 17

## INTRODUCTION

Plaintiffs' answering brief does not undercut Defendants' showing that the contempt order is based on factual and legal errors: The court rigidly applied an unsupported 10% substantial compliance threshold and thus failed to take the holistic approach this Court requires. The court ignored Defendants' evidence that it took all reasonable steps, and instead essentially imposed an all-possible-steps requirement. And the court required Defendants to show literal impossibility and failed to weigh all the evidence before erroneously rejecting Defendants' impossibility defense.

Plaintiffs also essentially admit that the court failed to afford Defendants due process when it imposed $120 million in "retrospective" fines "for completed acts of disobedience."[1] Because those fines are unconditional and not purgeable, they are "solely and exclusively punitive," entitling Defendants to criminal procedural protections that they did not receive.

Any one of these errors justifies reversal; together, they compel it.

## ARGUMENT

## I. THE DISTRICT COURT ERRED BY REJECTING DEFENDANTS' SUBSTANTIAL COMPLIANCE AND ALL-REASONABLE-STEPS DEFENSES.

Plaintiffs first contend that substantial compliance requires "(1) only 'a few technical violations,'" and "(2) 'every reasonable effort … to comply.'" (AB 25

---

[1] Total fines have now reached approximately $170 million.

1

(quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)).)  Plaintiffs also contend that "substantial compliance allows only for minor, technical departures."  (AB 26.)  But the substantial compliance defense is broader and more forgiving than Plaintiffs claim.

Substantial compliance is not limited to "minor, technical departures" or "technical violations" because, as this Court has observed, substantial compliance "must be determine[d] using a holistic view of all the available information" and "cannot be satisfied by reference to one particular figure."  *Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1122 (9th Cir. 2009).  And contempt is separately inappropriate if the party has substantially complied by taking all reasonable steps even if those steps have not resulted in complete compliance.  *See Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (stating all reasonable step standard without reference to whether violations were technical).  That is because the all-reasonable-steps defense looks to whether the party has made a "conscientious effort … to comply with" the court's order, not the degree of compliance.  *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406-07 (9th Cir. 1976); *Stone v. City and County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (noting same language from *Sekaquaptewa*). And a party may also avoid contempt if their actions are "based on a good faith and reasonable interpretation of the court's order."  *Dual-Deck*, 10 F.3d at 695 (cleaned up).

Here, Defendants substantially complied with the court's staffing orders by taking all reasonable steps to comply and by actually substantially complying. (AOB 42-49.)  Because the court plainly misread its prior orders, did not correctly apply the substantial compliance standard, and erroneously rejected Defendants' all-reasonable-steps defense, its contempt orders should be reversed.

### A. The District Court Misread Its Prior Orders and Failed to Holistically Assess Defendants' Substantial Compliance.

#### 1. The Court's Prior Orders Set 10% Vacancies as Full Compliance, Not as Substantial Compliance or a Safe Harbor.

Plaintiffs argue that the "October 2017 Order required '*complete compliance* with the staffing ratios in the 2009 Staffing Plan'" and "incorporated 'the *maximum* ten percent vacancy rate required by the court's June 13, 2002 order'" as a "safe harbor."  (AB 27 (quoting and emphasizing 6-ER-1290).)  But the plain text of the October 2017 order belies Plaintiffs' argument.  That order does not say the 10% vacancy rate is a "safe harbor" and, like each of the court's prior orders, the October 2017 order sets the 10% vacancy rate as the court-ordered threshold for *full compliance*.  (6-ER-1290; 6-ER-1233, 1238 (stating 2002 order set a "maximum ten percent vacancy rate"); 6-ER-1226 ("the same ten percent maximum vacancy rate applies to recreation therapists and medical assistants"); 7-ER-1451 (ordering Defendants to "maintain the vacancy rate … at a maximum of ten percent").)  The October 2017 order's reference to "complete compliance" also

3

did not transform the 10% full compliance threshold into a substantial compliance threshold. Rather, it merely confirmed that to achieve "complete compliance" Defendants must allocate at least 100% of the positions required by the 2009 Plan and meet the 10% vacancy rate for those allocated positions. (AOB 43-44.) Indeed, requiring 100% staffing for full compliance would set a standard that is impossible to meet because Defendants would immediately fall out of compliance if a clinician quit, retired, or left for any reason.

Plaintiffs next claim Defendants' court-ordered monthly vacancy reports show Defendants understood the 10% vacancy rate sets the minimum allowable threshold. (AB 27-28 (citing vacancy reports).) But Defendants did not set the "minimum" in those reports; the court did. (6-ER-1237.) And it did so because the court's prior orders required Defendants to achieve a 10% vacancy rate for *full compliance*, not because 10% was the substantial compliance threshold—indeed, that order again did not mention a substantial compliance threshold. (6-ER-1237-38 (requiring reports show filled positions needed "to comply").)

Thus, it was the court, not Defendants, that moved the full compliance goalposts from 10% to 0% vacancies, while transforming the 10% rate into an inflexible substantial compliance threshold.

4

### 2. The District Court Erroneously Rejected Defendants' Substantial Compliance Defense by Applying a Rigid 10% Threshold.

Rather than "holistic[ally]" consider Defendants' evidence as required by *Lab./Cmty*, 564 F.3d at 1122, the district court rejected their substantial compliance defense outright based on the unsupported 10% substantial compliance threshold. (AOB 46-49.) In their answering brief, Plaintiffs double down on the rigid 10% vacancy rate threshold for substantial compliance and misread the record.

Plaintiffs claim the court "did not mechanically apply the 10-percent safe harbor without considering additional evidence relevant to substantial compliance" because the court "held a four-day trial" focused on whether Defendants had substantially complied by taking all reasonable steps. (AB 33.) Putting aside the unsupported reference to a "safe harbor," the record shows that after Defendants' opening arguments during the contempt proceedings and *before hearing any evidence*, the court rejected Defendants' substantial compliance argument by asserting its prior orders required 0% vacancies and the 90% fill rate was the substantial compliance level. (6-SER-1533.) And per the contempt order, the October 2017 order "does not provide a basis for the position that anything greater than a ten percent vacancy rate can be considered substantial compliance." (1-ER-40.) That is why the court fined Defendants for any vacancy even 1% over the

10% threshold. (1-ER-42.) Thus, Plaintiffs' attempt to soften or defend the court's rigid application of substantial compliance fails.

And Plaintiffs' reliance on the court's erroneous assessment of Defendants' all-reasonable-steps defense (AB 33) conflates two separate issues. As discussed, a party may avoid contempt in several ways, including by actually substantially complying *or* by taking all reasonable steps to comply. Thus, the court's assessment of Defendants' all-reasonable-steps defense does not excuse the court's application of a rigid and unsupported 10% substantial compliance threshold in lieu of the required holistic approach. *See Lab./Cmty.*, 564 F.3d at 1122 (Substantial compliance is "a less precise standard that cannot be satisfied by reference to one particular figure.").

Next, Plaintiffs argue that Defendants did not substantially comply because Defendants' deviations were not "minor, technical departures" from the *100% fill rate* threshold. (AB 26-27 (citing vacancy rates compared to 100%).) Plaintiffs are wrong about the law (*supra* p.1-3) and they repeat the district court's errors— including its mistaken understanding of the full-compliance level, its improper focus on one particular figure, and its failure to holistically assess the evidence. (*See* AOB 43-49.) Plaintiffs do not dispute that during a nationwide mental health provider shortage, Defendants achieved modest success filling vacancies, including meeting or nearly meeting the 90% *full compliance* fill threshold for fourteen

straight months for psychiatrists and recreation therapists.  (AOB 18-21, 30.)  Yet, the court fined Defendants over $15 million for those two classifications alone because they slipped slightly below the 10% full compliance threshold.  (5-ER-1073.)

Although Plaintiffs quibble with Defendants' decision to use medical assistants to support telepsychiatrists, Plaintiffs do not dispute that the court is fining Defendants for vacant medical assistant positions that were not court-ordered and voluntarily allocated by CDCR.  (*See* AB 32; AOB 30-31, 45.)  Defendants showed that after the court applied the 10% vacancy rate to medical assistants in April 2023, CDCR voluntarily *increased* allocations in July 2023—before the September 2023 contempt hearing—and again in January 2024 and July 2024.  (*Contra* AB 32; AOB 30-31.)  Plaintiffs also ignore that Defendants substantially complied by reaching an 86% fill rate in December 2023 and would have approximately maintained or exceeded that rate in the following months but for Defendants *voluntarily* doubling the medical assistant allocation.  (AOB 30-31.)  In short, the court fined Defendants over $4 million for *voluntarily* allocating medical assistant positions and then later seeking to further improve mental healthcare for class members by *voluntarily* increasing the number of allocated positions.  (5-ER-1073.)  That error alone warrants reversal.

Plaintiffs do not dispute that the over 1,000 social workers and psychologists CDCR employs is nearly 50% more than the *total* mental health staff the 1990s study relied on by the district court found would be constitutionally adequate. (AOB 48). Similarly, although Plaintiffs disagree about how large the disparity is (AB 30-31), Plaintiffs cannot dispute that unrebutted evidence shows CDCR inmates have greater access to mental healthcare providers than the general California adult population (AOB 48). Dr. Greulich's unrebutted testimony explained that even when accounting for the greater percentage of incarcerated people who need mental health services, "access to psychologists at CDCR is 5 to 7 times that of the general population, and access to social workers is 1.5 to 2 times that of the general population." (2-ER-169-170.) Nor do Plaintiffs dispute that during a nationwide mental health provider shortage, CDCR employs one in every 24 psychologists and one in every 81 social workers practicing in California. (AOB 48.)

Plaintiffs brush those facts aside as "irrelevant." (AB 30-31.)[2] But where, as here, a party faces contempt, the "holistic" approach this Court mandates requires consideration of all evidence relevant to whether the party substantially complied

---

[2] While Plaintiffs reference a whistleblower report, Plaintiffs omit the dispute was largely based on competing interpretations of the Program Guide and that the court-appointed investigator found no intentional misrepresentation. (CR6147.)

with the court's order. *See Lab./Cmty.*, 564 F.3d at 1122. And here, the court never "holistic[ally]" considered Defendants' evidence because it erroneously focused exclusively on whether Defendants met a rigid 90% substantial compliance threshold that finds no support in the court's prior orders.[3]

### B. The District Court Erroneously Rejected Defendants' All-Reasonable-Steps Defense.

Plaintiffs do not dispute that for 25 years Defendants have made repeated and continuous efforts to reduce the staffing vacancy rate. (AOB 12-21, 24-29, 49-59); *see Dual-Deck*, 10 F.3d at 695. Yet, like the district court, Plaintiffs suggest other possible steps that could have been taken without any evidence that those steps are reasonable or would meaningfully affect the vacancy rate.

#### 1. Defendants Took All Reasonable Steps with Respect to Mental Healthcare Provider Compensation.

Plaintiffs fail to engage with the evidence about CDCR's mental health provider compensation, including Dr. Greulich's unrebutted testimony that compensation premiums have not and will not meaningfully affect the vacancy rate. (AOB 31-34.) For example, Plaintiffs assert Defendants should always make

---

[3] Defendants' challenge to the court's new interpretation of its prior orders is not, as Plaintiffs contend, a collateral attack on the 2009 Staffing Plan. (AB 28-29.) And Plaintiffs are wrong that "both the 2017 Order and the 2009 order made satisfactory [PLRA] findings[.]" (AB 29-30.) Neither order made the mandated PLRA findings for Defendants' "comprehensive" and "optimal" 2009 Staffing Plan. (7-ER-1420.)

*initial* employment offers above the minimum salary range. (AB 34-35.) But Plaintiffs do not dispute that CDCR has for many years advertised and made offers above the minimum based on the applicants' qualifications and recruitment challenges at the institution. (2-ER-342; 5-SER-1341-42, 1372-73.)

Similarly, Plaintiffs' vague complaints about the registry provider salary increases omit the classification-specific details that matter. (AB 38-39.) In 2022, Defendants did not *further* raise registry rates for psychiatrists because CDCR had achieved or nearly achieved the 90% full compliance threshold. (2-ER-280 (84%-92%), 289.) Conversely, to address the *new*, post-pandemic hiring challenges, CDCR increased registry rates by about 50% for psychologists, social workers, and recreation therapists. (*Id.*) Plaintiffs also omit that although no new payment *tiers* were added, CDCR did move institutions between tiers, which effectively increased the registry provider salary at those institutions. (5-SER-1418-1421, 1446-1447; *see also* AOB 26-27.) More fundamentally, Plaintiffs do not dispute that CDCR pays registry providers enormous premiums over both full-time CDCR employees and the California and nationwide averages, but those substantial pay premiums have not had a meaningful effect on registry hiring. (2-ER-184-85, 202.)

The same goes for Plaintiffs' complaints about civil servant salary increases. (AB 37-38.) The 2023 salary increases and bonuses are *on top* of the substantial

premiums that CDCR already pays compared to the California and nationwide averages, and Dr. Greulich found that those increases and bonuses did not meaningfully impact the vacancy rate in the past and "there [is] no reason to expect that this would change in the future." (2-ER-206; 3-ER-443; AOB 24-26, 31-35, 53-54.) That conclusion holds true regardless of inflation. (*Contra* AB 38; 6-SER-1644-45.) Absent contrary evidence, it would be unreasonable for Defendants to astronomically raise salaries to the levels Plaintiffs suggest. (AOB 54-55.)

Plaintiffs' criticism of Dr. Greulich's expert analysis parrots the district court's clearly erroneous view of Dr. Greulich's testimony. (AB 39-41; AOB 54-56.) For example, Plaintiffs repeat the court's criticism that Dr. Greulich supposedly did not analyze what wages and benefits CDCR would have to offer to recruit more mental healthcare staff because Dr. Greulich only studied past salary increases. (AB 39-40.) But past data informs the future and Dr. Greulich explained she would "need to make up data" to study whether hypothetical future higher wages would have a statistically significant impact on the vacancy rate. (3-ER-457-458; AOB 55-56.) Yet, the court expected Defendants to provide that speculative analysis to avoid contempt—a clear error Plaintiffs ignore. (AOB 55-56.)

Rather than performing a speculative analysis, Dr. Greulich studied CDCR's past salary and fill rate data to conclude (a) salary premiums did not meaningfully

reduce the vacancy rate in the past, and (b) there was no evidence to suggest additional premiums would meaningfully affect the vacancy rate in the future. (2-ER-196-97, 199, 201-02, 206; 3-ER-443.) That directly answers the questions that Plaintiffs and the district court claim went unanswered. (AB 39-40; *see* AOB 54-55.) And that is why the court clearly erred by concluding Dr. Gruelich's opinion "sheds no light on what future wage and benefit packages" are needed to incentivize future hiring. (1-ER-60; AOB 53-54.) That is another clear error that Plaintiffs ignore.

Plaintiffs also mistakenly claim that Defendants did not take all reasonable steps because Dr. Greulich's "analysis suggested 'uncertainty' about how effective higher compensation would be, not that it would be *in*effective." (AB 41.) In fact, Dr. Greulich testified, consistent with her overall opinion, that her analysis was informative about the effect of future salary increases. (5-SER-1278-1280, 1286-88.) That the vacancy rate responsiveness may change as the salary premium increases—as Dr. Greulich testified during her deposition—is entirely consistent with her overall opinion. (*See id.*)

Relatedly, Plaintiffs' criticism echoes the district court's erroneous view that Defendants did not "take *all steps* to raise salary levels" or show "it would be *impossible* to raise wages and benefits," (1-ER-58-59 (emphasis added)). Plaintiffs rightly do not defend that error, which impermissibly imposes an all-possible-steps

standard on Defendants. (AOB 54-55.) Yet, Plaintiffs also apply an all-possible-steps standard by arguing that Dr. Greulich's analysis failed to show whether future salary increases would be entirely "*in*effective." (AB 41.) The question, however, is whether offering additional salary premiums atop those CDCR providers already enjoy would be a *reasonable* step to durably achieve the 10% vacancy rate, not whether those increases would be entirely "ineffective." The available evidence showed further salary increases were not reasonable because future salary increases would likely not have a meaningful effect on the vacancy rate. (2-ER-196-97, 199, 201-202, 206; 3-ER-443.)[4]

None of the other evidence Plaintiffs cite rebuts that conclusion. Plaintiffs do not dispute that Dr. Brown's claim that "larger compensation packages could be expected to reduce vacancy rates" (AB 41-42) was fundamentally deficient because (a) he only studied labor shortages for psychiatrists and psychologists up to 2020; and (b) he did not analyze CDCR's actual salary data and instead used decades-old data about *physicians* to speculate about CDCR's mental health clinicians' responsiveness to wage changes. (AOB 34-35, 62-63.) And tellingly, the court did not rely on Brown's flawed opinion. (*See* 1-ER-58-61.) Nor did the

---

[4] Plaintiffs also criticize Dr. Greulich's analysis as coming "far too late." (AB 40-41.) That is a puzzling criticism because Defendants did not offer her analysis as one of their "reasonable steps" toward compliance, but rather to put Defendants' efforts in context and defend against contempt.

court rely on the Special Master's labor economist report that Plaintiffs cite. (AB 42.) That five-year-old, detail-less report focuses on psychiatrists, confirms CDCR's psychiatrists earn higher salaries than psychiatrists at private and public California employers, and comes nowhere near rebutting Dr. Greulich's expert analysis. (7-SER-1944-45.) The same goes for anecdotal testimony about Kaiser's compensation levels (AB 42), which at best shows one employer may have offered more to a couple of CDCR employees.

So, contrary to Plaintiffs' strawman, Defendants do not contend "that only the amounts the State has agreed to in the past can be deemed reasonable as a matter of law." (AB 43.) Rather, Defendants showed they should not be held in contempt for approximately $170 million based on clearly erroneous factual findings and pure speculation that future salary increases might move the needle, despite unrebutted expert testimony to the contrary. (AOB 49-59.)

### 2. That Other *Possible* Steps Existed Does Not Show Defendants Did Not Take All *Reasonable* Steps.

The court erroneously required Defendants to prove a negative by demonstrating anything CDCR could have done would have had no impact on future hiring. (AOB 55.) That has nothing to do with the impact of salary increases on CDCR's budget, as Plaintiff suggest. (AB 42.) It instead addresses Plaintiffs embracing the court's post-hoc recitation of other *possible* steps CDCR could have taken without any evidence those steps are reasonable or would have a

meaningful effect on the vacancy rate (which in some cases conflicted with evidence that the steps were ineffective in the past).

For example, Plaintiffs admit that Defendants have conducted a system-wide hiring analysis, but complain it was started eight years ago and did not sufficiently reduce the hiring time. (AB 34.) Plaintiffs are wrong on both counts. CDCR conducted a system-wide analysis in 2016 and *again* in 2022 as part of its continued efforts to increase staffing and improve the hiring process. (5-SER-1392-93.) While Plaintiffs assert the hiring time is "still-excessive" (AB 34), they do not dispute that Defendants have cut that time nearly in *half.* (5-SER-1392-93, 1395.) Regardless, Plaintiffs' complaints about hiring times ring hollow given the dozens of *one-day* recruitment events where Defendants hired candidates on the spot. (3-ER-459-63.) If those one-day hiring events have not brought Defendants into compliance, there is no reason to believe further hiring-timeline reductions would do so.[5]

Plaintiffs also contend that Defendants' telework policies are "too little, too late." (AB 36-37.) That contention is unfair given that Plaintiffs have persistently fought Defendants' telemental health and telepsychiatry policies, including recently in *Coleman v. Newsom*, No. 23-15755, 2024 WL 4298158 (9th Cir. Sept.

---

[5] Relatedly, Plaintiffs incorrectly assert Defendants' regional hiring unit was not created until after the contempt proceedings; in fact, it was operational before the September 2023 contempt proceedings. (3-ER-459, 465.)

26, 2024), where Plaintiffs vigorously defended the court's erroneous refusal to consider Defendants' telepsychiatry policy that would have made it easier to recruit psychiatrists.  This Court reversed that order.

Similarly, Plaintiffs and the Special Master have sought to curtail CDCR's use of telemental health, and nothing supports Plaintiffs' claim that the court approved an expansion of the program for psychologists and social workers.  (AB 36 (citing only 1-ER-62-65; 5-ER-1055-59).)  Plaintiffs also do not dispute that CDCR had to seek funding for the program from the Legislature—which CDCR did before the September 2023 hearing (*contra* AB 37)—and build out infrastructure for the program, including hiring supervisors.  (2-ER-77-90; 3-ER-482-87.)  Nor do Plaintiffs dispute the necessity of those steps or defend the district court's criticism of Defendants for not instantaneously allocating for hundreds more telemental health positions—a measure that would not have been *reasonable* without first determining whether the program would be successful or whether the court would even approve a smaller program (which the court notably still has not done).  (AOB 57-58.)

Plaintiffs' defense of the court's bevy of possible, but unreasonable, steps also fails.  Plaintiffs do not dispute that CDCR had little success when it attempted to cluster inmates in 2017 or CDCR's conclusion that clustering would *decrease* employee retention while creating prison-management concerns.  (6-ER-1306-

1308, 1311; 7-ER-1357-1358; AOB 56-57.)  Instead, Plaintiffs simply say the court was entitled to insist on some evidence to *again* cross off that tried and failed—and therefore unreasonable—step.  (AB 44.)  Further, Plaintiffs and the district court are wrong that CDCR's attempts to hire "'*tele*psychiatrists from metropolitan areas'" provides a basis to infer that clustering "'could aid recruitment.'"  (*Id.* (quoting 1-ER-61; emphasis added).)  Any success in recruiting those remote-working candidates simply does not speak to whether clustering inmates at prisons near urban areas will help recruitment.  More importantly, telepsychiatrist recruitment does not address or rebut the undisputed retention and prison-management concerns created by clustering high-acuity class members at the same locations.  (AOB 56-57.)  Defendants should not be fined $170 million based on an unsupported inference that an already tried-and-failed measure "could aid recruitment."  (1-ER-61.)

There are also several problems with Plaintiffs' assertion that CDCR should have released thousands of seriously mentally ill inmates because CDCR has done so before.  (AB 44-45.)  To begin, Plaintiffs have never cited anything that gives Defendants the *current* legal authority to take that step, which they lack given the absence of an ongoing state of emergency—such as the Pandemic—that previously provided the legal authority for the releases Plaintiffs cite.  *See* Cal. Penal Code

section 2900(b); Cal. Gov. Code Section 8658.[6]  Plaintiffs also did not submit any evidence showing which seriously mentally ill inmates Plaintiffs contend can be safely released early, much less evidence suggesting there is a significant percentage of such class members.  Similarly, while Plaintiffs say Defendants should increase credit earnings under Proposition 57 (AB 44-45), Plaintiffs omit that Defendants took that step in 2017 (AOB 15-16) (and again in 2021), and it did not have any meaningful impact on the *Coleman* population.

Plaintiffs' contention that the court "did not even consider" Defendants' decision not to request state law waivers contradicts the court's own words:  "The court does not require additional evidence to determine [D]efendants" could have requested waivers of unspecified state laws "and currently have chosen not to take it."  (1-ER-37; AB 45-46.)  But to avoid contempt, Defendants were only required "to take all reasonable steps within [their] [] *power* to comply," *Dual-Deck*, 10 F.3d at 695 (emphasis added), and Defendants could no more unilaterally waive state law than they could change the numerous court orders impeding recruitment. (AOB 59; *see, e.g.*, 3-ER-511-17; 6-ER-1241-53.)[7]

---

[6] Plaintiffs' reliance on the 2009 general inmate population reductions are misplaced because the 2009 order gave Defendants legal authority to take that step.

[7] Plaintiffs cite two inapplicable cases that address a federal court's authority to waive state law, not whether seeking such a waiver is necessary to avoid contempt.  *See Spain v. Mountanos*, 690 F.2d 742, 745-46 (9th Cir. 1982) (not discussing contempt); *Hook v. Arizona Dep't of Corr.*, 107 F.3d 1397, 1402 (9th Cir. 1997) (affirming court's refusal to modify injunction).

Plaintiffs' reliance on state law waivers in the post-contempt, court-ordered Spending Plan is also misplaced. (AB 45-46.) Those waivers merely underscore that Defendants lacked the power to take that post-contempt step unilaterally. In any event, Plaintiffs do not seriously dispute that court-ordered waivers are not reasonable because they would not yield a durable solution that could extend beyond court supervision. (*Id.*; AOB 59.)

Lastly, Plaintiffs say that the "identified steps may not comprise all" available steps because the court speculated that the other named defendants who did not testify—such as the Governor of California—might have testified about some other, unspecified options available to them. (AB 47; 1-ER-61.) But that proves Defendants' point. The court erroneously rejected Defendants' all-reasonable-steps defense based on other *possible*—and this time unspecified—steps Defendants might have taken. The court's speculation about other possible steps amounted to holding Defendants in contempt for not eliminating every other *possible* step. That was clear error.

## II. THE DISTRICT COURT ERRONEOUSLY REJECTED DEFENDANTS' IMPOSSIBILITY DEFENSE.

Contempt is inappropriate where the party has a "*present* inability to comply with the order." *U.S. v. Rylander*, 460 U.S. 752, 757 (1983). Plaintiffs say that means "literal impossibility," implying that Defendants cannot show impossibility because some mental health providers remain available to hire in California. (AB

48-50.)  But the cases Plaintiffs cite stand for the far narrower proposition that a party may not rely on self-induced roadblocks to prove impossibility.  *See Hook*, 107 F.3d at 1404 (no impossibility where state-defendant passed law prohibiting payment of court-ordered fees); *F.T.C. v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) (applying "especially high" burden to impossibility argument premised on funds hidden in offshore account that party controlled).

This Court has previously rejected the strict impossibility standard Plaintiffs cling to.  In *Falstaff Brewing Corp. v. Miller Brewing Co.*, the district court held plaintiff in contempt for failing to return documents as required by a protective order despite the plaintiff, its former counsel, and its new counsel testifying they could not locate the documents.  702 F.2d 770, 773-76 (9th Cir. 1983).  In a split decision, this Court reversed.  The dissent argued for affirmance because "there was no evidence that the missing records no longer existed"—i.e., evidence showing literally impossibility—and because the district court implicitly found the plaintiff "could comply with the protective order."  *Id.* at 787 (Wallace, J. dissenting in relevant part).  But the majority implicitly rejected that literal impossibility position and reversed because plaintiff's and its counsels' unsuccessful searches showed it was currently impossible for the plaintiff to comply with the court's order.  *Id.* at 780-782.

20

*Chairs v. Burgess* is consistent with *Falstaff* and addresses impossibility where external circumstances prevent compliance with the court order. 143 F.3d 1432, 1436-38 (11th Cir. 1998). The district court in *Chairs* rejected the defendants' argument that compliance was impossible because orders in other actions prevented defendants from complying with the underlying order. *Id.* at 1436-38. The Eleventh Circuit reversed because the district court improperly applied an overly demanding "inability" showing that required "strict[] impossibility." *Id.* The Eleventh Circuit explained that the impossibility defense "does not mean that compliance must be totally impossible" because "[c]ourts cannot blind themselves to reality." *Id.* at 1437-38; *see also Rylander*, 460 U.S. at 757 (Courts should "not be blind to evidence that compliance is now factually impossible.").

Here, as in *Chairs*, Defendants' inability to comply with the 10% vacancy rate order (or even the court's newly-announced 0% vacancy rate) was not self-induced. Unrebutted evidence showed non-compliance resulted from external factors such as a nationwide mental health provider shortage (AOB 20-21), the general recruitment challenges faced by correctional institutions (2-ER-156-157; 3-ER-466-467), and the CDCR-specific challenges caused by the "overwhelming" and "redundant" documentation requirements imposed by the district court—challenges which neither the court nor Plaintiffs even acknowledge. (3-ER-511-

517; AOB 63-64.) And Defendants' undisputed, 25-year history of unsuccessful attempts to comply with the 10% vacancy rate is much stronger evidence than the unsuccessful searches in *Falstaff* that this Court found sufficient to support impossibility.

The district court also contravened *Falstaff* by not "weigh[ing] all" of that aforementioned evidence before erroneously rejecting Defendants' impossibility defense. *See* 702 F.2d at 781 n.6. Plaintiffs' attempt to bolster the court's impossibility analysis fails because it largely rests on parts of Dr. Greulich's testimony the court did not rely on. (*Compare* 1-ER-67 *with* AB 49-50.) Like the district court, Plaintiffs fail to acknowledge that Dr. Greulich repeatedly and explicitly distinguished between an employer's ability to hire incrementally more providers and CDCR's ability to hire hundreds more. (AOB 63-65.) For example, Dr. Greulich testified that although "in theory" CDCR could hire sufficient social workers because "anything is possible," that possibility "would be a more feasible [] concept" "if the labor market conditions were to change." (5-SER-1273.) Further, even if the court had properly understood Dr. Greulich's testimony, it still improperly rejected the impossibility defense because the court did so only on, at best, two witnesses' testimony about whether it was *theoretically* possible for CDCR to hire hundreds more mental health providers. (1-ER-66-67.) That falls

22

far short of "weigh[ing] all the evidence" as *Falstaff* requires. *See* 702 F.2d at 781 n.6.

Plaintiffs' claim that the court considered the effects of the Pandemic (AB 50) is incorrect and ignores Defendants' prior showing. Rather than assessing whether the Pandemic affected Defendants' "*present* inability to comply" as required by *Rylander*, 460 U.S. at 757, the court erroneously dismissed the Pandemic's effect because "[D]efendants should already have been in full compliance" in 2018. (1-ER-62; AOB 62 n.17.) Likewise, Plaintiffs are incorrect that the court considered Dr. Brown's testimony about current labor market shortages when discussing impossibility. (*See* AB 50.) The court did not cite that testimony (1-ER-66-67), and nothing suggests the court credited Dr. Brown's testimony over Dr. Greulich's—that itself would be another clear error, as Plaintiffs do not dispute that Dr. Brown only studied labor shortages for psychiatrists and psychologists up to 2020. (AOB 62-63.)

The court compounded its clear error by concluding—without any evidence—that compliance "may be more difficult or expensive for [D]efendants" but not impossible. (1-ER-67; AOB 65.) Plaintiffs rightly do not defend that conclusion, which is contradicted by this action's 25-year history, the Special Master's own observations, Dr. Greulich's testimony, and Defendants' extensive—but ultimately unsuccessful—attempts to comply with the court's 10% vacancy-rate orders.

### III. THE DISTRICT COURT IMPOSED SERIOUS, PUNITIVE FINES WITHOUT PROVIDING CRIMINAL DUE PROCESS.

Plaintiffs concede that no portion of the accrued fines will be forgiven even if Defendants comply with the 10% vacancy rate tomorrow.  (AB 53-54.)  Under binding precedent, that concession is fatal.  The court imposed approximately $120 million in unconditional fines "retrospectively for [] 'completed act[s] of disobedience'"—each vacancy above the 10% threshold—and as Plaintiffs admit, Defendants "cannot avoid or abbreviate th[ose] [fines] through later compliance." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828-29 (1994); *Falstaff*, 702 F.2d at 779-80.  Those "'determinate and unconditional' fines" are therefore "'solely and exclusively punitive,'" entitling Defendants to criminal due process protections that they never received.  *Bagwell*, 512 U.S. at 836.

That requires reversal and should be the end of the inquiry, but even if it is not, Plaintiffs' scattershot responses miss the mark.

Plaintiffs first claim that the fines are not retrospective because once Defendants comply, they "will be relieved of [their] obligation to pay *future*" fines. (AB 54.)  That confuses the $120 million in fines the court imposed for conduct between April 2023 and May 2024—i.e., backward-looking fines for conduct that occurred before any Defendant was held in contempt—with the forward-looking fines Defendants began accruing after they were held in contempt.  Under *Bagwell* and *Falstaff*, the backward-looking fines are prototypical criminal fines "imposed

24

retrospectively for [] 'completed act[s] of disobedience.'" *Bagwell*, 512 U.S. at 828; *Falstaff*, 702 F.2d at 779-80. *Bagwell* could not be clearer on this point: "Had the trial court simply levied the fines after finding the union guilty of contempt"—as the court did here—"the resulting 'determinate and unconditional' fines would be considered 'solely and exclusively punitive.'" 512 U.S. at 836.[8]

*Bagwell* also forecloses Plaintiffs' contention that the February 2023 prospective fine schedule gave Defendants the necessary opportunity to purge. (AB 54-56.) *Bagwell* explained that a prospective fine schedule is not "meaningfully distinguish[able] … from the ordinary criminal law" because, like any criminal law, a prospective fine schedule simply announces "the conduct to be prohibited and [] the sanction to be imposed." 512 U.S. at 836-37. *Bagwell* explained that a prospective fine schedule alone is therefore "more closely analogous to fixed, determinate, retrospective criminal fines which [the party] ha[s] no opportunity to purge *once imposed*." *Id.* (emphasis added). That "*subsequent* opportunity to reduce or avoid the fine through compliance," *id.* at 829 (emphasis added)—i.e., a purge opportunity *after* being found in contempt and fined—must be "unequivocal," *Falstaff*, 702 F.2d at 780.

---

[8] *Bagwell* held that the fines there were criminal regardless of whether they accrued before or after the trial court announced its prospective fine schedule. *See* 512 U.S. at 824-25, 838-39. Though the same is true here, this Court need not decide whether the *post*-contempt fines are criminal because Defendants are plainly entitled to criminal due process protections for the retrospective fines.

Plaintiffs' misunderstanding of this independent purge requirement infects the rest of their arguments.[9]  Plaintiffs contend that the February 2023 prospective fine schedule provided an opportunity to purge because fines only came due if "accumulate[d] for three consecutive months."  (AB 52.)  But at that point, the court had not held Defendants in contempt or fined them, so that could not have been a "subsequent opportunity" to purge.  *Bagwell*, 512 U.S. at 829, 37.

That three-month period also falls short of an opportunity to purge because it did not allow Defendants to "reduce or avoid the fine[s] through compliance."  *Id.* at 829.  Under the February 2023 order, fines continued accumulating indefinitely for every month CDCR exceeded the 10% threshold by even 1%, and *all* accumulated fines would come due if Defendants ever fell out of compliance for a third consecutive month.  6-ER-1238.  For this reason, Plaintiffs wrongly assert that "once the State complies, it will be relieved of its obligation to pay *future*" fines.  (AB 54.)  In fact, the plain text of the February 2023 order and the contempt order extends the prohibition and corresponding punishment indefinitely—just like any ordinary criminal law.  (1-ER-75; 6-ER-1238-39.)

---

[9] The misunderstanding also shows why Plaintiffs fail to distinguish *F.J. Hanshaw* and *Falstaff*.  (AB 58.)  As with the $120 million in retrospective fines here, those cases concluded the fines at issue were punitive because they were unconditional and, in *F.J. Hanshaw*, "serious."  (*See* AOB 70.)

Next, Plaintiffs suggest that Defendants could have purged any time after the contempt proceeding in September 2023 and before the Court's June 2024 contempt order. (AB 52-53.) But tellingly, Plaintiffs cite nothing for that assertion, which is not supported by the February 2023 order or any other order. Regardless, that "purge" opportunity fails for all the same reasons just discussed.

Lastly, Plaintiffs say the court gave Defendants an opportunity to purge by referring the parties to a mediator to give Defendants "'one more chance to demonstrate the will and determination to comply.'" (AB 52-53, 55 (quoting 1-SER-250).) That was not an opportunity to purge because Defendants did not "carr[y] the keys of [their] prison." *Bagwell*, 512 U.S. at 828. Any potential settlement required agreement from Plaintiffs, likely review by the Special Master, and ultimately court approval, and compliance would again be subject to market and other external factors beyond Defendants' control. Relatedly, the court's subjective view of Defendants' "will and determination to comply" is not an "unequivocal opportunity to purge." *Falstaff*, 702 F.2d at 780.[10]

None of the cases Plaintiffs cite undermine *Bagwell* or *Falstaff*, and none suggest that Plaintiffs' supposed "purge" opportunities are sufficient. Unlike here, *Salazar v. Dist. Columbia*, 602 F.3d 431, 434-35 (D.C. Cir. 2010), and *CBS*

---

[10] Moreover, Plaintiffs are flat wrong that the contempt order contained findings concerning Defendants' "will and determination." (*Compare* AB 55 (citing 1-ER-67-68) *with* 1-ER-67-68.)

*Broadcasting, Inc.*, 814 F.3d 91, 102 (2d Cir. 2016), involved *per diem* fines—

which *Bagwell* confirmed were prototypical coercive sanctions, 512 U.S. at 828-

29—for conduct that occurred *after* the party was held in contempt.  Indeed,

*Salazar* recognized that, under *Bagwell*, those post-contempt, per diem fines do not

translate to—as is the case here—"unconditional fine[s]" levied for past violations

"imposed 'after a finding of contempt'" which are "'criminal if the contemnor has

no subsequent opportunity to reduce or avoid the fine through compliance.'"

*Salazar*, 602 F.3d at 440 (quoting *Bagwell*).

  Similarly, *NLRB v. Ironworkers Local 433*, 169 F.3d 1217 (9th Cir. 1999), is

inapposite for several reasons.  There, the National Labor Relations Board asked

this Court to hold a union in civil contempt for violating a prior consent decree,

which *itself* set a fine schedule for future violations.  *Id.* at 1218.  The National

Labor Relations Act, which governed those proceedings, is "generally regarded to

be a civil regulatory and remedial statute."  *Id.* at 1219.  *Ironworkers* did not depart

from that well-settled understanding when it held criminal procedural safeguards

were unnecessary in the NLRB consent decree context because—unlike in *Bagwell*

and here—the "contempt enforcement provision [] in [the] consent decree [] was

entered into long before th[e] conduct occurred."  *Id.* at 1221.  *Ironworkers* also

specifically distinguished *Bagwell*'s concerns about a single trial court judge being

"'solely responsible for identifying, prosecuting, adjudicating, and sanctioning the

contumacious conduct'" from the NLRB consent decree context where those powers are spread between several entities. *Id.* at 1219-21 (quoting *Bagwell*). It is therefore unsurprising that this Court has never cited *Ironworkers* outside the NLRB context.

*Parsons v. Ryan*, 949 F.3d 443 (9th Cir. 2020), is likewise inapposite. That case involved a partially compensatory $1.5 million fine accrued over three months, and the court did not make any findings that the fine was "serious." *See id.* at 452, 456. Here, by contrast, neither Plaintiffs nor the district court claim the fines are compensatory, and Plaintiffs do not dispute that the approximately $170 million fine here is "serious"—one of the other hallmarks of criminal contempt. (AOB 69-70); *see Bagwell*, 512 U.S. at 829, 837-38 (describing compensatory fines as civil and concluding "serious" fines weigh in favor of criminal contempt protections). And unlike in *Parsons*, the court below will continue to commandeer significant State funds each month until CDCR's staffing somehow bucks its 25-year history and reaches the court-mandated threshold.

The contempt order here also bears the other hallmark of criminal sanctions: The fines are based on "out-of-court violations of a complex injunction." *Bagwell*, 512 U.S. at 837; (AOB 69). Plaintiffs only respond to that obvious fact by asserting the present fines are "closer to [] direct contempt" than in *Bagwell* because the court has been overseeing this action for years. (AB 56.) But

Plaintiffs fail to square that assertion with the undisputed fact that the underlying injunction here indefinitely governs Defendants' conduct at 32 different institutions across California. That is exactly the type of injunction concerning "widespread, ongoing, out-of-court" conduct that *Bagwell* held weighs in favor of criminal due process protections. *See* 512 U.S. at 837 (violations "lasted many months and spanned a substantial portion of the State"). Even if this were "direct contempt"—and it is not—"direct contempt[] also cannot be punished with serious criminal penalties absent the full protections of a criminal jury trial." *Id.* at 833. Moreover, Plaintiffs ignore *Bagwell*'s warning that mandated procedural protections are all the more important where, as here, a court seeks to punish contemnors in an action it has overseen for years because that "comes perilously close to fusing the power which our Constitution separates." *Evans*, 206 F.3d at 1297 (discussing *Bagwell*); (AOB 70-71).

This Court should reverse because the $120 million in retrospective fines are "'determinate and unconditional' fines" that are "'solely and exclusively punitive.'" *Bagwell*, 512 U.S. at 836. Doing so will not, as Plaintiffs hyperbolically claim, "eliminate coercive civil contempt and render federal injunctions meaningless." (AB 54.) District courts remain free to craft purgeable coercive sanctions or to levy unconditional fines on criminal contemnors, so long as they provide due process when doing so. Indeed, *Bagwell* recognized that it

imposed a burden on district courts, but that burden was not "entitled to more consideration than the interest of the individual not [to] be subjected to serious criminal punishment without the benefit of all the procedural protections … fundamental to our system of justice." 512 U.S. at 839. Because Defendants did not receive those protections before being fined a total of nearly $170 million, this Court should reverse.

## IV. THE DISTRICT COURT DID NOT USE THE LEAST POSSIBLE POWER WHEN IT SANCTIONED DEFENDANTS' $170 MILLION IN FINES.

Plaintiffs contend the court used "the least possible power" when it sanctioned Defendants approximately $170 million. But none of Plaintiffs' arguments address that the court went straight from $0 in sanctions to *$170 million*. (*See* AB 57-58.) If Plaintiffs and the court truly believed that higher salaries and bonuses or other non-punitive enforcement mechanisms would better resolve CDCR's staffing vacancies, then the court could have simply issued an order mandating them in accordance with the PLRA instead of sanctioning Defendants. Plaintiffs also fault Defendants for "never propos[ing] an alternative" fine. (*Id.*) But it was the court's duty, not Defendants, to craft a sanction "us[ing] the 'least possible power adequate to [achieve] the end proposed.'" *Spallone v. U.S.*, 493 U.S. 265, 276 (1990). Lastly, Plaintiffs contend the court "narrowly tailored" its order by not sanctioning Defendants "for vacancy rates below the 10-percent threshold or for any other actions that do not violate the district court's

31

specific and definite orders." (AB 57.) But that contention is a red herring because sanctions obviously cannot be imposed for a non-violation. The court's failure to employ the least possible power when sanctioning Defendants is yet another reason for reversal.

## CONCLUSION

This Court should reverse the June 25 and June 27, 2024 contempt orders.

Dated: November 12, 2024          Respectfully submitted,

　　　　　　　　　　　　　　　　*s/Randall D. Zack*
　　　　　　　　　　　　　　　　_____

Rob Bonta
　*Attorney General of California*
Monica N. Anderson
　*Senior Assistant Attorney General*
Neah Huynh
　*Supervising Deputy Attorney General*
Randall D. Zack
　*Deputy Attorney General*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-4023

I am the attorney or self-represented party.

**This brief contains** | 6,982 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( ● ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [ ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Randall D. Zack | **Date** | 11/12/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

**Form 8** | *Rev. 12/01/22*