# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RALPH COLEMAN; PETER COCKCROFT; ERNESTO VENEGAS; JULIO GARZA, | No. 24-4023 |
| | D.C. No. 2:90-cv-00520-KJM-DB |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| GAVIN NEWSOM; JEFF MACOMBER; JOE STEPHENSHAW; STEPHANIE CLENDENIN; AMAR MEHTA; DIANA TOCHE, | |
| *Defendants – Appellants*. | |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted December 6, 2024
San Francisco, California

Filed March 19, 2025

Before: A. WALLACE TASHIMA, JOHNNIE B.
RAWLINSON, and MILAN D. SMITH, JR., Circuit
Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Prisoner Civil Rights

In an ongoing class action initiated in 1990 by a group of
California state prisoners alleging that the State of California
violated the Eighth Amendment by failing to provide
constitutionally adequate mental health care in its prisons,
the panel affirmed the district court's order holding the State
in civil contempt, vacated the district court's imposition of
fines to the extent they exceeded the State's monthly salary
savings, and remanded.

In 2017, following years of unsuccessful remedial orders
and ongoing communications with the court-appointed
Special Master, the district court gave the State one last year
to comply with the core requirement that the State bring
health care provider staffing vacancies down to fixed
levels. By 2023, the State had remained far from
compliant. In response, the district court established a
schedule of prospective, conditional fines that would begin
accumulating every month that the State failed to achieve its
staffing obligations. The fines were based on the

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

approximate salary savings that the State achieved by failing to fill the required staffing positions. In 2024, after finding persistent noncompliance, the court issued its final contempt findings: the state's noncompliance had resulted in the accrual of over $110 million in fines.

The panel held that the district court did not err In holding the State in civil contempt of applicable staffing orders and in rejecting the State's substantial compliance defense and its impossibility defense. The panel further held that the imposed contempt fines were civil in nature and did not require criminal due process protection. Nevertheless, the panel determined that the fines imposed by the district court were not sufficiently tethered to the record. In particular, the panel was concerned with the court's calculation of the fines based upon a doubling of the State's monthly salary savings. Therefore, the panel vacated the fines to the extent that they exceed the State's monthly salary savings, and remanded to the district court for additional findings and analysis as to the exact amount of fines that should be imposed.

## COUNSEL

Lisa Ells (argued), Alexander Gourse, Ernest Galvan, Maya E. Campbell, Adrienne P. Harrold, and Michael W. Bien, Rosen Bien Galvan & Grunfeld LLP, San Francisco, California, for Plaintiffs-Appellees.

Randall D. Zack (argued), George R. Morris, and Oliver Wu, Deputy Attorneys General; Neah Huynh, Supervising Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, San

Francisco, California; Elise O. Thorn, Deputy Attorney General, Office of the California Attorney General, Sacramento, California; David C. Casarrubias-Gonzalez, Gary A. Watt, and Rosanna Gan, Hanson Bridgett LLP, San Francisco, California; for Defendants-Appellants.

## OPINION

M. SMITH, Circuit Judge:

In 1990, a group of California state prisoners filed a lawsuit alleging that the State of California had violated the Eighth Amendment by failing to provide constitutionally adequate mental health care in its prisons. The prisoners, who later achieved certification as a class action, prevailed following a bench trial in 1995. The State was adjudged to be in violation of its Eighth Amendment obligations, and plans were developed to bring it into compliance. Over three decades later, however, efforts have stalled, and critical problems have endured. Despite years of patience by the judicial system, the class members, and many interested parties, the State has remained unable to carry out its constitutional mandate to ensure adequate mental health services for the thousands of individuals in its care. In the meantime, the number of state prisoners with serious mental health needs has substantially increased. The combination of inadequate mental health care and spiking patient populations has produced predictably grave results: delays in access to life-saving care, inadequate medication management, and a heightened risk of deaths by suicide.

Against this background, the district court initiated enforcement proceedings. In 2017, following years of

unsuccessful remedial orders and ongoing communications with the court-appointed Special Master, the district court had given the State one last year to come into compliance with a core component of the court's remedial program—the requirement that the State bulk up staffing by bringing vacancies among designated health care providers down to fixed levels. But by 2023, the State remained far from compliant with the court's orders. In response, the district court established a schedule of prospective, conditional fines that would begin accumulating every month that the State failed to achieve its staffing obligations. After months of fines accrued, the court oversaw hearings to consider the propriety of civil contempt sanctions. Finally, in 2024, the court issued its final contempt findings: The State's persistent noncompliance with the court's orders had resulted in the accrual of over $110 million in fines, which the district court expected to be paid.

The State timely appeals from that outcome. As it did before the district court, the State presents no argument— and in fact explicitly disclaims—that it actually complied with the court orders necessary to fulfill its Eighth Amendment obligations. However, the State contends that fines are foreclosed by its substantial compliance with applicable orders, and, in the alternative, by the impossibility of total compliance. The State further argues that the serious nature of the district court's fines elevate its punishment to the level of criminal, as opposed to civil, contempt. The State argues that the district court erred by failing to provide it with commensurate due process protections, such as a jury trial and factfinding beyond a reasonable doubt.

We reject the State's arguments. We agree with the district court that the State failed to satisfy its burden of proof to present either a substantial compliance defense or

6            COLEMAN V. NEWSOM

an impossibility defense. Further, we agree that the nature of the district court's fines was civil, not criminal, and that the district court provided adequate corresponding due process protections. Nevertheless, we find that the specific fines imposed by the district court are not sufficiently tethered to the record. In particular, we are concerned with the court's calculation of the fines based upon a doubling of the State's monthly salary savings. Therefore, we vacate the fines only to the extent that they exceed the State's monthly salary savings, and we remand for the district court to further explain its reasons for the exact amount of fines that it determines to impose.

## FACTUAL AND PROCEDURAL BACKGROUND

The origins of this action date back to 1990, when a group of prisoners filed a lawsuit pursuant to 42 U.S.C. § 1983 against the State of California (the State). *See Coleman v. Wilson*, 912 F. Supp. 1282, 1293 (E.D. Cal. 1995). Plaintiffs, who are state prisoners suffering from serious mental disorders, alleged that the mental health care provided by the California Department of Corrections and Rehabilitation (CDCR) was so deficient as to deprive them of their Eighth Amendment right to constitutionally adequate health care. *Id.* at 1293, 1297–98. Plaintiffs brought their claims against a group of state officials, all in their official capacities, representing the highest levels of California's executive branch. *Id.* at 1293. Those officials presently include Gavin Newsom, the Governor of California; Jeff Macomber, the Secretary of CDCR; and Stephanie Clendenin, the Director of the California Department of State Hospitals.

Following a bench trial in 1995, the district court concluded that the State had violated the Eighth Amendment

by acting with deliberate indifference to the mental health needs of the plaintiffs, who had, by then, achieved certification as a class. *Id.* at 1293, 1319. It determined that "[t]he constitutional violation which ha[d] been found [wa]s the product of systemwide deficiencies in the delivery of mental health care." *Id.* at 1324. To remedy those deficiencies, the district court appointed a Special Master to help the State plan and implement a constitutionally adequate mental health care system. *Id.* The plans on which the State and the Special Master collaborated were ultimately compiled into a set of policies and protocols known as the Mental Health Services Delivery System Program Guide (the Program Guide). First developed in 1997, and updated on several occasions since then, the Program Guide has been determined to "represent[] . . . what is required to remedy the Eighth Amendment violations identified in this action and to meet [the State's] constitutional obligation to deliver adequate mental health care to seriously mentally ill inmates." *Coleman v. Brown*, 938 F. Supp. 2d 955, 972 (E.D. Cal. 2013); *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1106 (E.D. Cal. 2014); *see also Coleman v. Brown*, 756 F. App'x 677, 679 (9th Cir. 2018).

The Program Guide prescribes an extensive framework for the provision of mental health services of varying levels and types to class members with varying needs and manifestations of mental illness. Although this framework does not expressly regulate staffing, it was soon discovered that its execution would require the State to drastically increase its employment of mental health care professionals. *See, e.g.*, *Coleman*, 938 F. Supp. 2d at 984–88. To address that problem, the district court, working in collaboration with the parties and the Special Master, issued a series of orders through which it directed the State to bring its

COLEMAN V. NEWSOM

vacancy rates among designated categories of mental health care providers down to fixed targets. Most notably, in 1999, the court ordered the State to reduce its vacancy rate for psychiatrists to 25 percent and its vacancy rate for psychiatric social workers to ten percent. Thereafter, in 2002, the court affirmed the ten percent vacancy rate for psychiatric social workers and further ordered the State to reduce its vacancy rate for psychiatrists and psychologists to ten percent.

Despite extensive efforts by all interested parties, these staffing orders failed to achieve their desired effect. By 2008, the State's vacancy rate remained in the range of 22 to 36 percent for all mental health care professionals and in the range of 30 to 54 percent for psychiatrists specifically. *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 934 (E.D. Cal. 2009). Four years later, the overall vacancy rate still hovered around 29 percent. *Coleman*, 938 F. Supp. 2d at 985. In response to these setbacks, the State and the Special Master worked together to develop new measures to increase staff recruitment and retention. But by 2017, nearly 20 years after the district court's first staffing orders, overall vacancy rates remained in excess of ten percent, and the vacancy rate for psychologists and psychiatrists approached 33 percent. The district court, noting that it "[wa]s past time for defendants to complete the task of hiring sufficient mental health staff," ordered the State to "take all steps necessary to come into complete compliance with . . . the maximum ten percent vacancy rate" (the 2017 Order). The court asked that the State achieve complete compliance by the end of 2018.

But the State did not achieve compliance by the end of 2018. Nor did it do so by the end of 2019, 2020, 2021, or 2022. Finally, in 2023, facing the State's continued noncompliance, the district court initiated enforcement

proceedings (the 2023 Order). It noted that "for twenty years defendants ha[d] been under court order to maintain [] mental health staffing vacancy rate[s]," and that, despite the passage of time, the State had never achieved compliance with the 2017 Order or other past orders. The district court accordingly set a schedule of prospective fines that would begin to accumulate on March 31, 2023, and would continue every month that the State failed to reach the ten percent vacancy rate set forth in applicable staffing orders. [1] The fines, which would be based on the approximate salary savings that the State achieved by failing to fill the required positions, would not accumulate unless the State failed to comply for a three-month period. If fines accumulated for three consecutive months, the district court would commence contempt proceedings in order to impose payment.

Even in the face of this threat, the State continued to fail to address its staffing shortages, and fines began to accumulate. By the end of 2023, those fines had accumulated for three consecutive months, and the parties gathered for evidentiary hearings to consider the propriety of civil contempt charges. During those proceedings, which took place over the course of five days, the State did not dispute that the 2017 Order was enforceable through contempt or that it had failed to actually comply with the order. Instead, it argued that it had substantially complied by taking all reasonable steps to comply and, in any event, that a nationwide staffing shortage had made actual

---

[1] The 2023 Order specifically ordered the State to achieve a ten percent vacancy rate with respect to five classifications of mental health care providers: psychiatric social workers, psychologists, psychiatrists, recreation therapists, and medical assistants.

10          COLEMAN V. NEWSOM

compliance impossible.  In support of its defenses, the State offered the testimony of a labor economist, Dr. Erica Greulich, and several CDCR employees who spoke to the agency's hiring practices.  Plaintiffs rebutted this evidence with the testimony of a health economist, Dr. Timothy Brown, and additional CDCR employees.

In March 2024, the district court entered tentative contempt findings but suspended its order for 60 days to allow the parties to attend mediation.  The mediation was unsuccessful, and the district court thereafter issued its final contempt findings in June 2024 (the Contempt Order).[2]  It found that the 2017 Order was sufficiently specific and definite to be enforceable by contempt, and that clear and convincing evidence established the State's noncompliance. The district court further found that the State had not proffered sufficient evidence to establish its substantial compliance or impossibility defenses.  Finally, the district court rejected the State's argument that it was entitled to heightened due process protections consistent with the allegedly criminal nature of the contempt fines.  Based on these findings, the district court held three of the named defendants in contempt and ordered payment, within 30 days, of all accumulated fines.

The State timely appealed.  While its appeal was pending, the State moved for a temporary stay of the Contempt Order, which we granted.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. *Hilao v. Est. of Marcos*, 103 F.3d 762, 764 (9th Cir. 1996).

---

[2] On June 27, 2024, the district court issued an updated order in which it clarified parts of the Contempt Order and changed certain deadlines.

We review a district court's civil contempt order for abuse of discretion. *FTC v. EDebitPay, LLC*, 695 F.3d 938, 943 (9th Cir. 2012). "[D]eference to the district court's exercise of discretion is heightened where," as here, "the court has been overseeing a large, public institution for a long period of time." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992); *see also Hutto v. Finney*, 437 U.S. 678, 688 (1978).

We review a district court's factual findings in connection with a contempt order for clear error. *Kelly v. Wengler*, 822 F.3d 1085, 1094 (9th Cir. 2016). "The issue of whether a district court provided an alleged contemnor due process . . . is a legal question subject to *de novo* review on appeal." *Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1458 (9th Cir. 1996).

## ANALYSIS

### I. The district court did not clearly err by rejecting the State's substantial compliance defense.

The State first contends that the district court clearly erred by rejecting its substantial compliance defense. "[S]ubstantial compliance with a court order is a defense to an action for civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986); *see also Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891–92 (9th Cir. 1982). This defense is available to an alleged contemnor that has "taken 'all reasonable steps' to comply" with applicable court orders, resulting in merely "technical or inadvertent [sic] violations" of those orders. *Gen. Signal Corp.*, 787 F.2d at 1379; *see also Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009). In other words, the substantial

compliance defense excuses an alleged contemnor who, despite not achieving total compliance, has achieved near-total compliance through the exhaustion of all reasonable efforts. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). A party that raises this defense bears the burden of establishing its applicability. *Stone*, 968 F.2d at 856 n.9.

The district court found that the State failed to show substantial compliance with the 2017 Order because it did not take all reasonable steps available to comply and did not come close to actual compliance. To assess whether the district court clearly erred in making this finding, we must answer two questions. First, what were the obligations with which the State was required to comply? Second, did the State substantially comply with those obligations by taking all reasonable steps to comply, leaving only "technical or inadvertent" violations? *See In re Dual-Deck Video*, 10 F.3d at 695 (substantial compliance with a court order "is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply" (quoting *Vertex Distrib.*, 689 F.2d at 891)).

### a. The 2017 Order set a ten percent vacancy rate.

The first step necessary to assess the State's substantial compliance defense is to identify the obligations with which the State was required to comply. The State argues that the "plain text of the underlying orders establish that Defendants were required to achieve a 10% vacancy rate for each of the five classifications at issue": psychiatrists, psychologists, psychiatric social workers, recreation therapists, and medical assistants. We agree. The ten percent vacancy rate was first introduced in 1999, when the district court ordered the State to reduce the vacancy rate for psychiatric social

workers to ten percent, and was cemented in 2002, when the district court extended the ten percent vacancy rate to psychologists and psychiatrists. Fifteen years later, in the 2017 Order, the district court confirmed these figures by ordering the State to "come into complete compliance with the . . . [2002 order's] maximum ten percent vacancy rate." This was the vacancy rate that the State was again ordered to achieve in the 2023 Order, on which the contempt fines are premised.[3]

The State nevertheless contends that the district court moved the goalposts in the Contempt Order by insisting upon a perfect zero vacancy rate, such that the State was required to achieve a ten percent vacancy rate merely to establish substantial compliance. This argument fails. The Contempt Order repeatedly confirmed that the benchmark for actual compliance was "a ten percent vacancy rate systemwide in [all] of the five classifications at issue." It also confirmed that "100 percent compliance with the maximum ten percent vacancy rate [was] the starting point[] for the court's assessment of whether defendants [we]re in substantial compliance." These statements reflect no expectation that the State surpass the ten percent vacancy rate set forth in the 2017 Order. Instead, consistent with the nature of the substantial compliance defense, they establish a framework for assessing whether, why, and to what extent the State failed to achieve actual compliance with the ten percent vacancy rate based on its pursuit of all reasonable efforts to comply. *Gen. Signal Corp.*, 787 F.2d at 1379; *see*

---

[3] An addendum to the 2023 Order clarified that the ten percent rate was applicable to all five classifications of mental health care employees, including medical assistants and recreation therapists.

*also Lab./Cmty. Strategy Ctr.*, 564 F.3d at 1122. This framework was not erroneous.

### b. The State did not substantially comply with the ten percent vacancy rate.

The next step necessary to assess the State's substantial compliance defense is to evaluate whether the State took "all reasonable steps" to achieve the ten percent vacancy rate, such that its failure to do so was merely "technical or inadvertant [sic]." *Gen. Signal Corp.*, 787 F.2d at 1379. The district court found that the State failed to satisfy these two requirements because it failed to take all reasonable steps to achieve a ten percent vacancy rate and because its noncompliance was not "technical or inadvertent" but, instead, "serious and consequential, negatively so." We discern no clear error in either of these findings.

### i. The State did not take all reasonable steps to comply.

The district court did not clearly err by finding that the State failed to take all reasonable steps to comply with the 2017 Order. In support of its defense, the State offered the testimony of Dr. Greulich and CDCR employees who spoke to various efforts the State had pursued to lower vacancy rates and generally improve patient outcomes. These efforts included expanding the State's telepsychiatry program; launching a new telehealth program focused on psychologists and social workers; participating in new hiring events; conducting a system-wide analysis of procedures and protocols; and raising salaries for mental health providers.

As the district court noted, this evidence reflected that the State took many steps to pursue compliance with the ten percent vacancy rate. "But merely taking significant steps

toward implementing [a] decree falls far short of 'substantial compliance.'" *Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016). Instead, to establish this defense, a contemnor bears the heavier burden of showing that it took "*all* reasonable steps to comply" with court orders. *Kelly*, 822 F.3d at 1096; *Stone*, 968 F.2d at 856 n.9. The State did not make this showing because it neglected to pursue certain reasonable steps that were available to it.

One of the reasonable steps available to the State pertained to the working conditions of its mental health staff. In a 2020 report, the Special Master observed low retention rates and high rates of job dissatisfaction among on-site providers due to concerns about office spaces and employment conditions. The Special Master suggested that the State direct its attention toward these issues. However, during the district court's contempt hearings, CDCR clinicians testified that serious problems persisted. These clinicians explained that staff were frustrated with—and frequently vacated their positions due to—their workloads, which were high and accompanied by egregious paperwork demands; their security protections, which were perceived as insufficient; their lack of support, both clinically and administratively; and their physical workspaces, which often took the form of windowless converted cells in old and unheated prisons. The State did not rebut this evidence or present any reason that it could not pursue reasonable steps to ameliorate the identified problems. Further, when the State's primary expert, Dr. Greulich, was asked about staff working conditions, she opined that she was not only unfamiliar with those conditions but had no "opinion on how CDCR's working conditions could be improved to fill vacancies."

16          COLEMAN V. NEWSOM

Other reasonable steps were also available to the State. In connection with the contempt hearings, Plaintiffs introduced evidence of logistical defects in the State's recruitment efforts, such as delays in contacting job applicants that were leading to the loss of eligible candidates before they were even offered interviews. Plaintiffs also introduced evidence that providers were unhappy with the lack of pension reform and clamoring for further telehealth offerings. This evidence, which highlighted tangible gaps in the State's hiring and recruitment processes, demonstrated the availability of additional reasonable steps that the State could pursue to reduce vacancies. But the State mounted no meaningful rebuttal to this evidence other than to point to other reasonable steps it had pursued. Because the State bore the burden of showing not that it pursued some reasonable steps, but all reasonable steps, the district court did not clearly err by finding that the State failed to establish this element of its substantial compliance defense. *Stone*, 968 F.2d at 856 n.9; *see also Rouser*, 825 F.3d at 1082 ("While [substantial compliance] is not amenable to a 'mathematically precise definition,' . . . merely taking significant steps toward compliance comes nowhere near satisfying this exacting standard." (quoting *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011))).

In opposition to this conclusion, the State criticizes the district court for numerous perceived errors in its assessment of the evidence and its commentary about other reasonable steps the State might have pursued. Some of these criticisms are valid. However, they do not bear on the reasonableness of the above-mentioned steps that the State could have pursued to achieve compliance with the target vacancy rates. For example, although the State asserts that the district court misstated elements of Dr. Greulich's testimony, her

positions played no role in the district court's findings that the State might reasonably have addressed its staffing challenges by ameliorating working conditions, reducing bottlenecks in recruitment, or expanding its telehealth program. Therefore, to the extent that the district court misstated Dr. Greulich's testimony or engaged in other similar inaccuracies, any such errors are harmless and illustrate no clear error in the district court's overall findings. *See Kelly*, 822 F.3d at 1096 ("A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took *all* reasonable steps to comply.").

### ii. The State's violations were not "technical or inadvertent."

The district court also did not clearly err by finding that the State's violations of the 2017 Order were not "technical or inadvertent." As noted, actual compliance required the State to reduce its vacancy rates for all five classifications of mental health care professionals to ten percent or less. But the State did not come close to achieving these numbers. During the 14 months preceding the Contempt Order, the State oversaw adequate staffing with respect to psychiatrists and recreation therapists, with the vacancy rate ranging between 6 and 15 percent for the former group and between 8 and 15 percent for the latter. By the State's own admission, however, this period saw the vacancy rate for social workers range between 17 and 29 percent and the vacancy rate for medical assistants range between 14 and 43 percent. Most troublingly, during the 14-month period preceding the Contempt Order, the State's vacancy rate for psychologists never fell below 35 percent. As the district court properly found, these numbers did not reflect technical or inadvertent compliance with the 2017 Order. Instead, they reflected serious and significant shortcomings in meeting the target

18          COLEMAN V. NEWSOM

vacancy rates that the State had been under order to achieve for two decades.

Further, as the district court correctly reasoned, this noncompliance by the State was not only not technical in nature but "serious and consequential" in effect. CDCR staffing does not occur in a vacuum. Instead, it directly impacts patient outcomes by shaping whether prisoners with serious mental health needs are afforded opportunities to access essential, even lifesaving, care. During the contempt hearings, Plaintiffs illustrated this causal pathway through evidence that recent staffing shortages had caused self-harm incidents to spike, severed existing pathways for care, and generally placed class members at a "grave and unacceptable risk of harm." Due to these extreme impacts, the State's vacancy rates, both in principle and practice, well exceeded the bounds of substantial compliance. *See Lab./Cmty. Strategy Ctr.*, 564 F.3d at 1122 ("Our analysis requires we do more than simply count the number of technical deviations from the decree. Instead, we must determine, using a holistic view of all the available information, whether [the alleged contemnor's] compliance with the Decree overall was substantial.").

## II. The district court did not clearly err by rejecting the State's impossibility defense.

The State next contends that the district court clearly erred by rejecting its impossibility defense. "Inability to comply with an order is . . . a complete defense to a charge of contempt." *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980); *see also Turner v. Rogers*, 564 U.S. 431, 442 (2011). "It is settled, however, that in raising this defense, the [noncomplying party] has a burden of production." *United States v. Rylander*, 460 U.S. 752, 757 (1983).

Specifically, "the party asserting the impossibility defense must show 'categorically and in detail' why he is unable to comply." *FTC v. Affordable Media*, 179 F.3d 1228, 1241 (9th Cir. 1999) (quoting *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973)). "If the record establishes that there in fact is a present inability to comply with a[n] [] order, the 'civil [contempt] inquiry is at an end.'" *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 (9th Cir. 1983) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 74 (1948)).

The district court did not clearly err by finding that the State failed to establish an impossibility defense. The State had specifically argued that compliance was impossible because of a nationwide staffing shortage that had circumscribed its ability to hire mental health care providers. In support of this argument, the State relied on the report and testimony of its labor economist, Dr. Greulich. Dr. Greulich explained the existence and impact of the staffing shortage, and she asserted that it had left the State with difficult challenges in hiring. For example, Dr. Greulich opined that, due to the shortage of available mental health care professionals, the State was unlikely to "meaningfully increase filled positions for the classifications at issue" merely by offering higher salaries or attempting to outbid competing employers. Dr. Greulich further opined that "[r]emaining proposed solutions" that might aid the State in its hiring efforts were "largely outside of CDCR's control."

Despite these statements, Dr. Greulich did not claim that the State could not achieve its court-ordered vacancy rates. Although she opined that certain solutions were unavailable to the State or of limited value in helping it to meet its targets, she acknowledged, for example, that telehealth was "one avenue that enhance[d] CDCR's ability to achieve its

20 COLEMAN V. NEWSOM

vacancy goals." Dr. Greulich offered no opinion that the State had exhausted this or other potential efforts to boost its hiring. Further, when asked expressly whether she was "offering the opinion that it's impossible for CDCR to hire psychologists," Dr. Greulich clarified that she was "not offering that opinion." Dr. Greulich offered similar answers when asked whether she was opining on whether it was impossible for the State to hire sufficient social workers and medical assistants.[4] Beyond Dr. Greulich, no other defense witness testified, opined, or purported to demonstrate that compliance with the 2017 Order was impossible.

As the district court reasonably found, this evidence showed that it would be "difficult or expensive" for the State to fill the positions necessary to achieve a ten percent vacancy rate. However, once again, the State's burden was not to show that compliance would be difficult or expensive. Instead, it carried the heavier burden of establishing that compliance was "factually impossible." *Rylander*, 460 U.S. at 757. The district court did not clearly err by concluding that the State had not made that showing where it failed to adduce evidence of impossibility or rebut clearly meaningful pathways that could potentially bring it into compliance. The district court was particularly well-equipped to reach that conclusion due to its ongoing involvement with the case since 1990, and its "overs[ight] [over] the implementation of the [case] for [over] a decade." *See Stone*, 968 F.2d at 856. That close involvement provided the district court with a unique ability to examine whether the State's obligations were impossible to achieve. *See id.*

---

[4] As previously noted, it is undisputed that the State functionally met the ten percent vacancy rate with respect to the two other classifications of employees—recreation therapists and psychiatrists.

The State presents two counterarguments to this conclusion, but neither is persuasive. First, the State contends that the district court clearly erred in its decision-making process because it ignored evidence that CDCR is subject to unique hiring challenges and that California's statewide staffing shortage will only worsen in coming years. But no evidence was adduced by the State to show that these circumstances would entirely prevent it from conducting increased hiring, particularly on the relatively minor scale that would be necessary for the State to achieve its target vacancy rates.[5] Therefore, this argument highlights no clear error in the district court's factfinding or analysis.

Second, the State attempts to shift the standard by suggesting that "'[i]mpossibility' for the purposes of contempt 'does not mean that compliance must be totally' or 'strictly impossible.'" Relying on *Chairs v. Burgess*, 143 F.3d 1432 (11th Cir. 1998), the State argues that the impossibility standard is instead satisfied by a showing that the noncomplying party has exercised all reasonable efforts to comply with court orders. This argument amounts to an attempt to replicate the substantial compliance standard. For the reasons previously discussed, because the State did not exercise all reasonable efforts to comply, that standard is not satisfied here.

In any event, *Chairs* does not shift the standard applicable to the State's impossibility defense. As a threshold matter, it was arguably overturned by *Turner*, in which the Supreme Court cabined the impossibility defense

---

[5] At the time of Dr. Greulich's deposition, Plaintiffs introduced evidence that the State could achieve a ten percent vacancy rate, at least with respect to medical assistants and social workers, by hiring 18 and 63 of each group, respectively.

22          COLEMAN V. NEWSOM

not to all instances of reasonable behavior but, instead, only
to instances in which "the alleged contemnor is *unable* to
comply with the terms of the order." *Turner*, 564 U.S. at 442
(emphasis added) (quoting *Hicks ex rel. Feiock v. Feiock*,
485 U.S. 624, 638 n.9 (1988)); *see also Rylander*, 460 U.S.
at 757 (impossibility defense is available where "compliance
is [] factually impossible"). Even if it did not, *Chairs* is not
the governing law in this circuit, where we have repeatedly
emphasized that the impossibility defense arises only from
literal impossibility that disables the alleged contemnor from
complying with the court's orders. *See Asay*, 614 F.2d at
660 (impossibility defense turns on "[i]nability to comply
with an order"); *Falstaff Brewing Corp.*, 702 F.2d at 781–82
(same); *see, e.g.*, *Affordable Media*, 179 F.3d at 1241
(rejecting impossibility defense where compliance "was
possible" and "not impossible"); *Hook v. Dep't of Corr.*, 107
F.3d 1397, 1404 (9th Cir. 1997), *as amended on denial of
reh'g and reh'g en banc* (Apr. 22, 1997) (rejecting
impossibility defense where "compliance was not physically
impossible"). For that additional reason, *Chairs* does not
control our analysis.

## III.  The district court provided adequate due process protections.

Finally, the State contends that the district court erred
because it imposed fines that were criminal in nature without
providing commensurate due process protections.[6]   In
response, Plaintiffs concede that, although criminal due

---

[6] As previously noted, whereas we review for clear error a district court's
factual findings in connection with a civil contempt order, *EDebitPay*,
695 F.3d at 943, we review de novo whether a district court provided an
alleged contemnor due process, *Thomas, Head & Greisen Emps. Tr.*, 95
F.3d at 1458.

process protections were not observed, the fines that were imposed were functionally civil. Thus, the parties' dispute turns on whether the district court's fines were criminal or civil in essence.

The Contempt Order nominally purported to impose civil sanctions. However, "the label affixed to a contempt" is not by itself "determinative." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, 838 (1994). Instead, "[t]o determine whether contempt sanctions are civil or criminal, we examine 'the character of the relief itself.'" *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020) (quoting *Bagwell*, 512 U.S. at 828). A "sanction generally is civil if it coerces compliance with a court order." *Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union, Locs. 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013). "A criminal sanction, in contrast, generally seeks to punish a 'completed act of disobedience.'" *Id.* (quoting *Bagwell*, 512 U.S. at 828). The distinction is material because criminal sanctions require greater due process, including a jury trial and proof beyond a reasonable doubt. *Bagwell*, 512 U.S. at 826–27; *see also F.J. Hanshaw Ents., Inc. v. Emerald River Dev., Inc*., 244 F.3d 1128, 1137 (9th Cir. 2001).

The State presents three reasons that the fines imposed by the district court here were criminal, as opposed to civil. Because we are not persuaded by these reasons, we agree with Plaintiffs that the fines were civil, and we affirm the district court's refusal to provide criminal due process protections.

### a. The fines were purgeable.

The State first contends that the fines imposed were criminal, not civil, because it was afforded no opportunity to purge, i.e., "reduce or avoid the fine[s] through compliance."

*Bagwell*, 512 U.S. at 829. Generally speaking, "the imposition of non-compliance fines following a failure to purge is a coercive, civil remedy." *NLRB v. Ironworkers Loc. 433*, 169 F.3d 1217, 1221 (9th Cir. 1999); *Bagwell*, 512 U.S. at 828–29. Thus, "the ability to purge is perhaps the most definitive characteristic of coercive civil contempt." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016); *see also Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1110 (9th Cir. 2005).

*Bagwell* explained the relevance of purging through an analogy to the dichotomy between civil and criminal imprisonment. 512 U.S. at 828–30; *see Lasar*, 399 F.3d at 1110. Just as "a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a 'completed act of disobedience,'" a non-purgeable criminal fine is one that is "fixed, determinate, [and] retrospective," providing the alleged contemnor no ability to avoid its imposition. *Bagwell*, 512 U.S. at 828, 837 (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 443 (1911)). In contrast, just as a conditional sentence of imprisonment is coercive and civil if the contemnor "carries the keys of his prison in his own pocket," a purgeable civil fine is one that is forward-looking and conditional, allowing the contemnor to avoid its imposition by altering some behavior. *Id.* at 828 (quoting *Gompers*, 221 U.S. at 442). As *Bagwell* explained, falling into the latter camp is "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order." *Id.* at 829. Such a fine is fundamentally coercive and civil because, so long as "the jural command is obeyed, the future, indefinite, daily fines are purged." *Id.*; *see also Shell Offshore Inc.*, 815 F.3d at 629–30.

The sanctions imposed here were purgeable for the same reason. Like a per diem fine imposed for future

noncompliance, the fines were the result of a forward-looking, conditional schedule that would impose fines only in "each [month] [the State] fail[ed] to comply with" the 2017 Order. *Bagwell*, 512 U.S. at 829. That schedule did not take effect until March 31, 2023—one month after the district court gave notice about the fee schedule on February 28, 2023—and, even then, fines did not begin to accrue until the State passed three months in noncompliance. As a result, as of the day the fine schedule was established, the State had four months to "reduce or avoid the fine[s] through compliance," and even more months to avoid successive monthly charges. *Id.* Like the civil contemnor imprisoned with the "keys of his prison in his own pocket," the State had full power to circumvent the sanctions it now faces. *Id.* at 828 (quoting *Gompers*, 221 U.S. at 442); *see also Parsons*, 949 F.3d at 456 ("Prospective, conditional fine schedules do not bear any of the hallmarks of punitive contempt, such as retroactivity and determinacy."); *NLRB*, 169 F.3d at 1221.

The State nevertheless insists that the fines were not purgeable because, once imposed, the State had no opportunity to "avoid or reduce the fines" by "subsequently comply[ing] with the 10% vacancy rate." But this argument misreads *Bagwell*. So long as a contemnor has an initial opportunity to reduce or avoid the initial imposition of a fine, the contemnor need not be afforded a second, subsequent opportunity to reduce or avoid the fine that was already imposed. *See Bagwell*, 512 U.S. at 828–30. In other words, "fines imposed without further opportunity to purge are not punitive when those fines are prompted by a party's previous failure to purge." *NLRB*, 169 F.3d at 1221. A contrary result, as Plaintiffs observe, would be nonsensical: "Were it otherwise, compliance with laws or orders could never be brought about by fines in civil contempt proceedings."

*Hoffman ex rel. NLRB v. Beer Drivers & Salesmen's Loc. Union No. 888*, 536 F.2d 1268, 1273 (9th Cir. 1976).

### b. The fines were not punitive.

The State next contends that the fines imposed were criminal in effect because they were based on "out-of-court violations of a complex injunction." *Bagwell*, 512 U.S. at 837. This argument finds support from *Bagwell*, which observed that "[c]ontempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding." *Id.* at 833–34. But *Bagwell* expressly "le[ft] unaltered the longstanding authority of judges . . . to enter broad compensatory awards for all contempts through civil proceedings." *Id.* at 838. Pursuant to that principle, we have held that "[a]lthough the 'line between civil and criminal contempt' can become 'blurred' in cases where 'noncompensatory sanctions' are predicated on 'out-of-court disobedience to complex injunctions,' no such blurriness exists" where the sanctions that are entered are compensatory in nature. *Parsons*, 949 F.3d at 456 (quoting *Ahearn*, 721 F.3d at 1129).

*Parsons* concluded that a district court's contempt sanctions were compensatory because they would be used "for the benefit of the class 'to further compliance'" with the court's orders. *Id.* Here, too, the district court imposed fines to "ensure the constitutional rights of members of the plaintiff class [we]re honored and protected." The district court crafted the fines to effectuate that outcome in two ways. First, the district court designed the fine schedule to disincentivize the State's noncompliance by eliminating the savings it achieved by leaving positions vacant. Second, like in *Parsons*, the district court ordered the parties to employ the funds to class members' benefit. *Id.* The spending plan

to which the parties ultimately stipulated will see the State direct the sanctioned funds toward hiring and recruitment measures that will directly improve staffing and, by extension, patient outcomes. In this way, the district court's fines are remedially focused on returning benefits for the class. *See id.*; *see also Hicks*, 485 U.S. at 632 ("If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court."); *Shell Offshore*, 815 F.3d at 629 n.4 ("Whether fines are payable to the opposing party or to the court may also be a factor in deciding whether they are coercive or compensatory.").

### c. The fines were serious.

Finally, the State contends that the fines imposed were criminal in effect because their substantial size renders them "serious." *Bagwell*, 512 U.S. at 837. In *Bagwell*, the Supreme Court concluded that fines in excess of $52 million were serious. *Id.* Similarly, in *F.J. Hanshaw Enterprises*, our court concluded that a $500,000 fine was serious. 244 F.3d at 1139 & n.10. Under those precedents, and a commonsense understanding of the term "serious," *see Serious,* Merriam-Webster, https://www.merriam-webster.com/dictionary/serious (last visited Oct. 6, 2023) (defining "serious" as "excessive or impressive in quality, quantity, extent, or degree"), the conclusion that that the district court's $111 million fine here is "serious" cannot be avoided.

Even so, that a fine is serious does not necessitate the conclusion that it is criminal. To the contrary, *Bagwell* considered the "seriousness" of the lower court's fine only in connection with its holding that, while all criminal sanctions require heightened due process protections, "the

right to trial by jury applies only to serious criminal sanctions." 512 U.S. at 837 n.5, 838–39. *F.J. Hanshaw Enterprises*, which also considered the seriousness of a criminal fine, likewise focused its analysis on the principle that "before serious *criminal* penalties can be imposed . . . , the contemnor must be afforded the full protection of a criminal jury trial." 244 F.3d at 1138. These precedents suggest not that the seriousness of a fine affects whether it is criminal but, instead, that the seriousness of a *criminal* fine affects what due process protections are required. As a result, these precedents do not disrupt our conclusion that the district court's fine here, although so large in size as to be "certainly serious," was ultimately civil due to its compensatory nature and the availability of purging. *See Bagwell*, 512 U.S. at 829 ("Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge.").

## IV. The district court did not sufficiently explain its calculations.

Although the seriousness of the district court's fines does not draw them into the category of criminal contempt, it draws our attention to a separate issue that the parties did not raise on appeal. Specifically, we note that, "in fixing the amount of a fine to be imposed . . . as a means of securing future compliance," courts must "consider the amount of [the] defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). For example, courts must consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.* Here, although the district court imposed serious and

substantial fines that ultimately exceeded $110 million, it neglected to provide a "reasoned consideration" of all of these criteria. *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983); *see also Parsons*, 949 F.3d at 457.

In particular, we note concern with the district court's lack of explanation or factfinding regarding the size of its fines. As noted, the fines are based on the average monthly salary for each unfilled position that the State would need to fill to reach a ten percent vacancy rate. That basic construction is reasonable and can be understood as an attempt to shift the State's incentives by eliminating the savings it achieves through noncompliance. However, the choice to increase the fines to double the amount of the State's monthly salary "savings" is a decision that is not as easily understood. As Plaintiffs suggest, it can be inferred that the district court set the fines at this level to eliminate the State's additional savings on items such as health insurance and retirement contributions. But the district court offered no such explanation for its calculations, and it made no findings or estimates about the extent of such potential savings by the State. In the absence of such details, we cannot conclude that the portion of the fines exceeding the State's monthly salary savings is calculated with the necessary level of precision. *See Spallone v. United States*, 493 U.S. 265, 276 (1990). Further factfinding and analysis are necessary to ensure that this portion of the fine is optimally calculated so as to deter noncompliance without imposing an excessive penalty.

## CONCLUSION

We conclude that the district court did not err or clearly err in holding the State in civil contempt of applicable staffing orders. We agree that the State did not excuse its

noncompliance through the establishment of a successful substantial compliance or impossibility defense. Further, we conclude that the contempt fines that were imposed were civil in nature and did not require criminal due process protections. Nevertheless, we express concern with the lack of explanation surrounding the district court's calculation of the fines. Because the calculation and analysis employed by the court is not sufficiently set forth in the record, we vacate the fines to the extent that they exceed the State's monthly salary savings, and we remand to the district court for additional findings and analysis as to the exact amount of fines that should be imposed.

**AFFIRMED in part, VACATED in part, and REMANDED.**

Costs are to be taxed against the appellants.